NOT DESIGNATED FOR PUBLICATION

No. 127,530

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
B.B., Aв.B., and A.B.,
Minor Children

MEMORANDUM OPINION

Appeal from Cowley District Court; NICHOLAS M. ST. PETER, judge. Submitted without oral argument. Opinion filed November 7, 2025. Affirmed.

*Anna M. Jumpponen*, of SJ Law, LLC, of Wichita, for appellant natural mother.

*Ian T. Otte*, deputy county attorney, for appellee.

*Jennifer Anne Passiglia*, guardian ad litem, of Law Office of Jennifer Passiglia, of Winfield.

Before WARNER, C.J., ARNOLD-BURGER and PICKERING, JJ.

PER CURIAM:  Mother challenges the district court's termination of her parental rights to B.B. (born in 2021), Ab.B. (born in 2020), and A.B. (born in 2019). On appeal, Mother raises two issues. First, Mother argues that she received ineffective assistance from her counsel. Second, Mother contends the State did not meet its burden to show that she would remain unfit for the foreseeable future or that it was in the children's best interests to have her parental rights terminated. After a thorough review of the record, we find that Mother cannot prove she was prejudiced by any alleged deficiencies of counsel. We also find the State proved by clear and convincing evidence that Mother would remain unfit for the foreseeable future and that termination of parental rights was in the children's best interests. We therefore affirm the district court.

1

FACTUAL AND PROCEDURAL BACKGROUND

The facts here are heartbreaking and tragic. On April 22, 2022, Mother took five-month-old B.B. to the hospital. When he arrived, B.B.

> "was barely conscious, his eyes were open with a right sided fixed gaze, ashen in color, lethargic and not responding appropriately. Medical personnel also noted that [B.B.] weighed 10 lbs., which was significantly underweight for his age. Reports show that [B.B.] had multiple dark linear discoloration to the left side of his face, bruising to the right side of his face; notable bruising inside the left ear; bruising to his neck and the back of his head; a cut over his right eye and a severe diaper rash."

In addition, B.B. had a collapsed lung and suffered brain death. B.B. began having seizures at the hospital and was transferred to Wesley Medical Center, where he was diagnosed with child physical abuse and child neglect. Hospital staff were unsure whether B.B. would survive.

The State filed a child in need of care (CINC) petition on the same day. It also filed a CINC petition for both of B.B.'s siblings, Ab.B. and A.B. The district court appointed a guardian ad litem (GAL) for the children and entered ex parte orders placing the children in the custody of the Secretary of the Department for Children and Families.

On April 25, 2022, the district court held a consolidated hearing for the three siblings. At the hearing, the district court appointed counsel for both parents. Mother requested the temporary custody hearing be continued until she had a chance to discuss it with her appointed counsel. The district court entered a no-contact order prohibiting either parent from having contact with any of the children.

On May 3, 2022, both parents waived a temporary custody hearing. Mother requested the ability to contact the children. The GAL and the State both objected. The district court denied Mother's request.

On May 31, 2022, Mother entered a statement of no contest to adjudicating the children in need of care, and the district court adjudicated Ab.B., A.B., and B.B. children in need of care. The GAL requested disposition be continued so she could file her report. The district court left the no-contact order in place until the disposition hearing.

The disposition hearing occurred on June 21, 2022. Based on the severity of B.B.'s injuries, the GAL recommended immediate termination of parental rights. The State echoed the GAL's request. The district court acknowledged both parents had pending criminal charges related to B.B.'s injuries but did not believe those charges required the CINC proceedings to "languish[]" until those charges were resolved. The court continued:

"The bottom line here that strikes me after I saw these photographs, first of all, I'll just say right up front I honestly thought I was looking at a corpse when I saw those photographs. That is how horrific this child's injuries are. I have been at this business for 19 years as a lawyer and nearly 18 years as a judge. I have been involved in criminal practice and child in need of care cases and truthfully I have never seen a child more horrifically abused than this one. To me the bottom line here is this, *I am not comfortable with moving forward with reintegration when we don't even know the truth*. We don't know how these injuries happened by the parents. They have given so many different stories none of which make sense with respect to the kind of injuries this child has. There has been conversations between them that obviously lead the Court in the position to believe that the truth has not been disclosed and the parents have conspired to keep that truth from being disclosed. Now I understand that they have a fifth amendment privilege and they can decide that they don't want to make any further statements. That is absolutely their right. I don't think that their children have to be held hostage simply because they choose to exercise their fifth amendment privilege. That is just the bottom

3

line. . . . I just don't see how we work reintegration until we have the truth. *Until we have the truth any reintegration plan in my view is likely to be inadequate to me (inaudible) on a long term basis to ever effectually reintegrate.*

"My belief and my finding is that at this point in time, the Court does not believe reintegration is a viable option. The parents hold the keys to that reintegration in their own hands. Should they wish to come forward, should they wish to provide truthful explanations regarding this that can be confirmed by the physical evidence we see with this child. *Confirming how this child was injured and what their course of conduct was then that may open the door to reintegration.* I feel like you're guessing at what the issues are. We are trying to let them work a plan of reintegration based upon that guess. Looking at the injuries this child has I'm not willing to guess with any other children in these [parents'] hands. They hold that key. . . . I don't think their children have to remain hostages within the [CINC] system where they can't get permanency and help they need simply because the parents choose to exercise the rights they have within a criminal case." (Emphases added.)

Regarding Mother's criminal case related to B.B.'s injuries, the State had filed criminal charges against Mother. The record is unclear what Mother was charged with, but she eventually pled to misdemeanor endangering a child and was placed on probation while the CINC case was pending.

The district court held review hearings in August 2022, October 2022, and December 2022. During a permanency hearing on March 9, 2023, Mother again requested visitation. In response, the State advised it intended to file a motion for termination of parental rights. The district court acknowledged Mother was completing her case plan tasks but reiterated that it was "still very concerned about the lack of real explanation about what happened here and making sure that whatever those issues are would be addressed." The State filed a motion for finding of unfitness and termination of parental rights on April 4, 2023.

4

At the April 27, 2023 review hearing, the GAL advised the district court that Mother met with the GAL three days earlier after expressing a willingness to speak with the GAL. Mother told the GAL she was at work and did not know how the injuries occurred. She stated that she and Father got into a fight the night before taking B.B. to the hospital, and Father accused Mother of being unfaithful and locked her out of the house. Mother indicated that she and Father had a history of domestic violence, and law enforcement had never allowed her to take the children and leave, which is why she did not call law enforcement. Mother also advised that a possible motive for why B.B. was injured was that Father did not believe B.B. was his biological child. Mother reiterated that she did not see any bruises or marks on B.B. until right before she took him to the hospital.

The district court stated:

"[T]his would have been much better had this occurred about six or eight months ago much earlier on in the case, where the Court could have taken that statement and maybe heard evidence from the medical professionals to try and ascertain that situation and perhaps had some evaluations completed. I think at this point with the motion pending the Court simply needs to hear all the evidence."

At the June 20, 2023 hearing on the State's motion to terminate parental rights, Father relinquished his rights. Thereafter, Mother, the GAL, and the State stipulated to the entire social file being admitted as evidence, as well as the GAL report. The social file indicated that, as of December 5, 2022, Mother had failed "all previous drug tests for marijuana," including a test on November 15, 2022. After December 2022, Mother passed all drug tests. Mother's counsel explained "that this is a situation where the facts aren't really disputed here, at least from the medical evidence," and believed "the information in the social file is also beneficial to [Mother] regarding what has been completed on the case plan and her cooperation with the agency."

5

Officer Jason Legleiter, a Lieutenant Detective in the Arkansas City Police Department, who responded to the hospital's report of a possible child abuse victim, testified B.B.'s injuries were extensive. He told the court:

> "The child appeared to have bruising above both the right and left eyelids. On the left side of his face there were what appeared to be three finger marks, some bruising on the left ear. On the right eye toward the bridge line of the nose and the eyelid there was a cut, or a healing cut, is what I'd describe it as."

He also observed "severe diaper rash or some type of markings on [B.B.'s] groin." Legleiter testified Mother's initial description of what happened—that one of B.B.'s siblings pushed the child out of a bouncer—did not seem consistent with B.B.'s injuries. He indicated his investigation revealed B.B. had not been seen by a doctor since his birth. Legleiter advised that, based on the various versions of events, the injuries occurred, at a minimum, two days before Mother took B.B. to the hospital, and people were telling Mother to take B.B. to the hospital during those two days. Legleiter told the court that B.B.'s injuries were characteristic of abusive injuries, not accidental injury.

B.B.'s foster parent testified. B.B. suffered a traumatic brain injury which caused cerebral palsy, seizures, and required a G-tube. B.B. attended appointments three days a week most weeks and had multiple surgeries. B.B. was blind and functioned far below his age. B.B. had begun having seizures again.

Ab.B. and A.B.'s foster parent testified. Both children refer to her and her husband as "mom" and "dad," and neither child has ever asked about their biological parents. She told the court neither child has a bond or attachment with their biological parents but had bonded with her and her husband.

Dr. Subhash Shah, a child neurologist, testified that B.B.'s neurological scans showed bilateral subdermal hematoma and extensive cerebral edema. In children, this is often the result of "shaken baby syndrome or non accidental trauma." He had diagnosed B.B. with spastic quadriplegic cerebral palsy, the most severe form of cerebral palsy for a child B.B.'s age.

After the State rested, the GAL asked the district court to take judicial notice of Mother's conviction for misdemeanor endangering a child. The GAL then rested.

The district court granted a short recess to allow Mother an opportunity to discuss with her counsel whether or not to testify. Following the short recess, her counsel advised that Mother declined to testify.

During arguments, Mother's counsel argued Mother completed all of the case plan tasks except for a specific class related to B.B.'s future needs. Mother was unable to complete this task because the agency was unable to find a suitable class for her. He argued the file showed Mother had been working and had maintained a residence for the last six months. He noted Mother was "doing well" on probation and suggested Mother was "doing the best she can in the circumstances that are here right now." Counsel argued that Mother had provided an explanation of B.B.'s injuries to the GAL to the best of her abilities and asked the district court not to terminate Mother's parental rights.

The district court found:

"When this case was filed it was certain that [B.B.] had undergone some very traumatic and severe injuries. Those injuries occurred sometime when he was with two of the adults that he had to depend on, that is his parents. The circumstances of those injuries, and how they arose were never really completely determined by the Court. The parties basically agreed to an adjudication. It was clear that he had been abused from the evidence that

7

was contained within the record. The circumstances were never really disclosed to the Court."

The district court noted that B.B.'s injuries occurred more than a day before Mother sought medical treatment for B.B. and found "that there had been neglect involved in seeking medical care for [B.B.] at the time when he needed it." The court explained that, during the pendency of the case, the court had "no confidence about returning [the] children to a parental home." It continued, "Frankly, the pictures I saw of [B.B.] at the time, that is the worst abuse I've seen of a child in my nearly 40 year legal career. It was horrific. It wasn't hidden. It's apparent."

The district court noted Mother changed her behavior in December—around the same time Father pled in his criminal case—and expressed its concern that Mother was still loyal to Father despite the injuries to B.B. The district court noted:

> "What is clear to me is that circumstances for all three of the children have changed dramatically since they were removed. They have now bonded to other caregivers. They apparently were never wholly bonded to their parents based on what I can see. Looking at, okay, if we did attempt reintegration, how is this going to move forward? Well, Mom has done some things. There are still a lot of questions I would have in my mind and it would take a substantial amount of time for those to be answered and for bonding to begin. I just don't think it could be done in a time consistent with the [permanency] needs of these children. They need [permanency] now. They have bonded with other caregivers. They are going to reintroduce someone new in their life to them and have them rebond or bond with that person for the first time. That takes a substantial amount of time, even if Mom was in a position to do so. Despite the classes and things Mom has done, I still don't have confidence about whether or not she would get herself into a similar situation with another man that may be abusive and be involved in the use of controlled substance. That she then would not end up using controlled substances and still be in the very same position where we are here again."

8

The district court found the State had proved by clear and convincing evidence that Mother was unfit under the following statutory factors: K.S.A. 38-2269(b)(2), (b)(3), (b)(6), (b)(8), (c)(2), and (c)(3). It found that Mother's circumstances were not likely to change in the foreseeable future "given the amount of time that has gone by that, and the amount of time the Court believes would be needed for [there] to be any type of a successful potential reintegration."

The district court also found it was in the best interests of the children to terminate Mother's parental rights and granted the State's motion to terminate parental rights.

Mother timely appealed.

ANALYSIS

On appeal, Mother argues counsel provided ineffective assistance because counsel failed to question the State's witnesses and failed to object to arguably inadmissible testimony. She asserts counsel was ineffective because he "simply presented no defense" on her behalf. She contends counsel "failed to challenge the State's narrative or provide even minimal adversarial testing of the case."

In addition, Mother argues the district court erred in terminating her parental rights. She concedes that "she could not refute all of the factors used by the District Court to ultimately find her to be presently unfit" because the district court never lifted its no-contact order. But, she argues, the district court erred when it determined that her circumstances were unlikely to change for the foreseeable future and erred when it found termination of her parental rights was in the best interests of the children.

9

*Ineffective Assistance of Counsel*

*Standard of Review*

Under K.S.A. 38-2205(b)(1), a parent has the right to be represented by an attorney, and an attorney may be appointed if the parent is unable to employ an attorney. Parents in termination proceedings have the right to competent legal counsel. *In re Rushing*, 9 Kan. App. 2d 541, 545, 684 P.2d 445 (1984).

Claims of ineffective assistance of counsel are analyzed under a two-prong test. First, the party must show counsel's performance was deficient. If counsel's performance was deficient, the reviewing court must then determine whether there is a reasonable probability that, but for any unprofessional errors, the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. James*, 319 Kan. 178, 184, 553 P.3d 308 (2024).

> "To establish deficient performance under the first prong, the defendant must show that defense counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances surrounding the challenged conduct, and evaluate the conduct from counsel's perspective at the time. A court considering a claim of ineffective assistance of counsel must strongly presume that defense counsel's conduct fell within the wide range of reasonable professional assistance; that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action might be considered sound trial strategy.
>
> "Under the second prong, the defendant must show that defense counsel's deficient performance was prejudicial. To establish prejudice, the defendant must show with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. A court hearing a claim of ineffective

10

assistance of counsel must consider the totality of the evidence before the judge or jury. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citations omitted.]" 319 Kan. at 184-85.

*Discussion*

Appellate courts generally will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal. The usual course is for appellate counsel to request a remand to the district court for an evidentiary hearing on the ineffective assistance claim, commonly called a *Van Cleave* hearing. See *State v. Van Cleave*, 239 Kan. 117, 120-21, 716 P.2d 580 (1986). Our court has not yet remanded for a *Van Cleave* hearing involving allegations of ineffective assistance during termination of parental rights cases; instead, panels have considered *Strickland* and determined remand was unnecessary. See *In re E.L.-C.*, No. 128,143, 2025 WL 1833850, at *5 (Kan. App.) (unpublished opinion) (listing examples), *rev. denied* 321 Kan. ___ (2025).

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Here, Mother cannot show prejudice because of the extreme injuries sustained by B.B. and the effect of the no-contact order. We therefore need not determine whether counsel's performance was deficient.

Based on B.B.'s extensive injuries, the district court entered a no-contact order on April 25, 2022, prohibiting Mother from having any contact with the children. The district court told Mother, "I just don't see how we work reintegration until we have the truth [about what happened]" but that "[t]he parents hold the keys to that reintegration in their own hands." The district court concluded, "Again, I'm just not willing to guess on

11

what I think the parent[s'] issues are or whether they are solvable until we know the truth."

Mother did not meet with the GAL to provide her version of events until April 24, 2023, nearly three weeks after the State filed its motion to terminate her parental rights. As a result, the no-contact order remained in place for more than one year, at a time when Ab.B. and A.B. were both under the age of five. Ab.B. and A.B.'s foster parents testified that neither child has ever asked about their biological parents.

Mother waited more than one year to tell the GAL her version of what happened to B.B. and, during this time, Mother had no contact with Ab.B. and A.B. For whatever reason, Mother waited until after the State moved to terminate parental rights before taking a step the district court deemed crucial to reintegration. We agree with the district court that, even assuming Mother was in a position for reintegration, the process of reintroducing Mother to Ab.B. and A.B., and ensuring a sufficient bond between them, would take a substantial amount of time and could not be accomplished in a reasonable time.

Even if we assume Mother's counsel provided ineffective assistance, given the facts of this case, we are confident that there is no reasonable probability that any deficiency affected the outcome of this case.

*Termination of Parental Rights*

*Standard of Review*

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence.

12

Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

*Findings of unfitness*

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right of custody, care, and control of the child, the parent is entitled to due process of law. But this "fundamental right to parent is not without limits." *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). Because child welfare is a matter of state concern, the State may assert its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

K.S.A. 38-2269(b) lists nonexclusive factors the court shall consider in determining unfitness. The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 38-2269(c). Any one of the factors in K.S.A. 38-2269(b) or (c) "may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 38-2269(f).

The district court found Mother was unfit based on the following factors:

- "[C]onduct toward a child of a physically, emotionally or sexually cruel or abusive nature"—K.S.A. 38-2269(b)(2);
- "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child"—K.S.A. 38-2269(b)(3);
- "unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death"—K.S.A. 38-2269(b)(6);
- "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"—K.S.A. 38-2269(b)(8);
- "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child"—K.S.A. 38-2269(c)(2); and
- "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home"—K.S.A. 38-2269(c)(3).

Mother concedes "she could not refute all of the factors used by the District Court to ultimately find her to be presently unfit" because the district court never lifted its no-contact order. Issues not briefed are waived or abandoned. *In re Adoption of Baby Girl G.*, 311 Kan. at 803. Thus, Mother has abandoned any claim that clear and convincing evidence does not support the district court's findings that K.S.A. 38-2269(b)(2), (b)(3), (b)(6), (b)(8), and (c)(2) and (c)(3) applied. Instead, Mother focuses her argument on the second prong of K.S.A. 38-2269(a)—that "the conduct or condition is unlikely to change in the foreseeable future."

14

*Conduct unlikely to change in the foreseeable future*

"When reviewing a district court's unfitness and foreseeability determinations, the appellate court considers whether, after review of the entire record, viewing all evidence in the light most favorable to the State, a rational fact-finder could have found the determination highly probable—i.e., by clear and convincing evidence." *In re K.W.D.*, 321 Kan. 100, 110, 573 P.3d 221 (2025). In determining whether there is clear and convincing evidence supporting the district court's determination, an appellate court does not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 321 Kan. at 110.

Courts must consider whether a parent's conduct is unlikely to change in the "'foreseeable future' from the child's perspective because children and adults have different perceptions of time." 321 Kan. at 112-13. As our Supreme Court explained: "[T]he statute does not presume that a parent's inability to care properly for their child ceases the moment a parent stops physically, emotionally, or sexually abusing a child under K.S.A. 38-2269(b)(2) or stops using intoxicating liquors or narcotic or dangerous drugs under K.S.A. 38-2269(b)(3)." *In re K.W.D.*, 321 Kan. at 113. Instead, "the critical question under Kansas law is not just whether the parent will be physically available, but whether the parent will be able to properly care for the child in a time frame consistent with the child's best interests." 321 Kan. at 113-14.

The district court here found that Mother failed to change her circumstances and only began "to make some efforts in the months prior to these termination proceedings." Further, Mother has had no visitation with the children since April 22, 2022, "due to the unexplained injuries to [B.B.]." The district court found that Mother "has not placed herself in a position for reintegration to occur with the minor [children] and the court does not believe her situation will likely change in the foreseeable future due to the additional time it would take the mother to get in the position to move forward." The

15

district court concluded that the children were not bonded with Mother and that "the time needed to create a bond between the child[ren] and the parent could not occur in a reasonable time considering the child[ren]'s perception of time."

Mother contends the district court erred because she made substantial progress on her case plan tasks. She asserts she completed several of her case plan tasks by June 2022, maintained appropriate employment and regular contact with the case team, and completed her mental health assessment and psychological evaluation without any recommendations given. Mother suggests her drug use was "so minimal that upon completing the drug and alcohol evaluation that there were no recommendations."

But the reports Mother cites in support of her contentions also undercut her arguments. An earlier report states: "[Mother] completed her drug and alcohol assessment on 06/15/2022 at four county. TFI has received a copy of this assessment. No recommendations were provided on the assessment, which concerns the case team as she consistently fails [drug tests]." Similarly, the report notes:

> "[Mother] completed a mental health assessment on 06/15/2022 at four county mental health. . . . [Mother] reports that she had a psych eval scheduled at four county on 11/11/2022. . . . The report is questionable as there are falsified reports made by [Mother] that she has not used marijuana since 2019."

Additionally, although Mother completed her parenting classes, she was unable to explain to the case team what she learned throughout the classes.

Mother had no contact—albeit under court order—with her children after April 25, 2022. At the time the no-contact order was entered, Ab.B. was 19 months old, and A.B. was just a few months shy of her third birthday. The hearing on the State's motion to terminate parental rights occurred on June 20, 2023, a little more than a year after the

district court entered the no-contact order. Thus, Mother had not had contact with Ab.B. for nearly one half of Ab.B.'s life and had not had contact with A.B. for nearly one third of her life.

Further, the district court had repeatedly told Mother that, before reintegration was possible, Mother needed to provide a truthful and reasonable explanation for B.B.'s injuries. Mother resolved her criminal case for endangering a child before December 20, 2022. Yet Mother did not meet with the GAL to provide her version of the events surrounding B.B.'s injuries until four months later, on April 24, 2023—after the State filed a motion to terminate her parental rights.

Clear and convincing evidence supports the district court's findings. Given the children's young ages and the lack of bond between the children and Mother, the district court did not err when it found Mother's condition was unlikely to change for the foreseeable future, especially when considered in child time. See *In re K.W.D.*, 321 Kan. at 112-13. Mother may be physically present, but, particularly given the lack of bond between the children and Mother, she will not be able "to properly care for the [children] in a time frame consistent with the [children's] best interests." See 321 Kan. at 113-14.

*Termination was in the children's best interests*

We review a district court's best-interests determination for an abuse of discretion. 321 Kan. at 115-16. A judicial action constitutes an abuse of discretion if it is based on an error of fact or law, or if no reasonable person would have agreed with the court's decision. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *In re A.S.*, 319 Kan. 396, 400, 555 P.3d 732 (2024).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best

interests of the child." K.S.A. 38-2269(g)(1). In making such a decision, "the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1).

Here, the district court found, "The court believes that it is in the best interest of these children that the rights of [Mother] as a mother to these children be severed at this time. For these reasons the Court finds that the State's Petition for Termination of Mother's Parental Rights should be granted."

Mother suggests that "termination is only appropriate in situations where there is no better alternative to termination to ensure that the needs of the children are being met" and argues that is not the case here. She contends that, had she "been given the opportunity to have visits with her children, she would have completed the case plan tasks and been in a position to reintegrate her children into her home." We disagree.

Mother has had no contact with Ab.B. for nearly half of Ab.B.'s life. And Mother has had no contact with A.B. for nearly a third of A.B.'s life. The district court entered the no-contact order based on the horrific abuse B.B. suffered and provided Mother the keys to have the no-contact order lifted. Despite this, Mother did not take the necessary steps to potentially regain visitation with the children until after the State filed its motion to terminate parental rights. Under these circumstances, reasonable people may disagree whether termination of parental rights was in the best interests of the children. Accordingly, the district court did not abuse its discretion.

Affirmed.